STATE OF MAINE
Cumberland, ss

BUSINESS AND CONSUMER COURT
Location: Portland
Docket No.: BCD-AP-11-09
BCD-AP-11-10

BANKERS LIFE & CASUALTY CO.
and MATTHEW F. JULIANO,

   Petitioners,

  v.

SUPERINTENDENT OF INSURANCE,

   Respondent

## *DECISION ON RULE 80C APPEAL*

In these consolidated appeals under Rule 80C, Maine Rules of Civil Procedure, Petitioners Bankers Life & Casualty Co. (Bankers Life) and Matthew F. Juliano[1] appeal from decisions of Respondent Superintendent of Insurance in which the Superintendent found that Mr. Juliano committed numerous violations of the Insurance Code in the course of selling three annuities to a client, and later, in borrowing money from the client, and also held Bankers Life responsible for the violations related to the annuities. (Administrative Record (hereinafter, "A.R.") 468-69.)

## *FACTUAL BACKGROUND*

Matthew Juliano is or was affiliated with the Bangor office of Bankers Life, but he lives and works in Aroostook County, about a three-hour drive from Bangor. (A.R. 446.) Due to the distance, Mr. Juliano was not in close contact with the office, and did not have a clear picture of the organizational structure at the Bankers Life office. (A.R. 446-47.)

---

[1] The underlying enforcement action included two other individuals, Timothy E. Farren and L. Eugene Gagnon, neither of whom was penalized. They are not parties to the present appeal.

1

Mr. Juliano met the client in question, Lucianne Belanger, in the fall of 2007. (A.R. 447.) He first spoke with her on the phone, and then met her at her home on October 31, 2007. (A.R. 447.) At the meeting, Mr. Juliano asked Ms. Belanger about her financial situation and objectives. (A.R. 447.) Ms. Belanger said that her only expenses were for her daily living, car, charities, and payments on her AMEX card; she owned her home. (A.R. 447.) At the meeting, Mr. Juliano determined that Ms. Belanger had suitable health coverage from her prior employment and did not need life insurance. (A.R. 448.) Mr. Juliano did raise with her the topic of purchasing Bankers Life annuities. (A.R. 448.)

At the time of Ms. Belanger and Mr. Juliano's first meeting, Ms. Belanger had three certificates of deposit (CDs) worth about $37,000, two individual retirement accounts (IRAs) worth $48,000, and General Electric (GE) stock valued at about $150,000. (A.R. 448-49.) Ms. Belanger had told Mr. Juliano that she needed $20,000 of her savings to be totally liquid and accessible for her use. (A.R. 462, 1227, 1260.) Mr. Juliano recommended liquidating the aforementioned assets and purchasing three separate Bankers Life annuities. (A.R. 448.) Mr. Juliano met with Ms. Belanger again on November 8, 2007, along with his supervisor Timothy Farren, to discuss the sale of Ms. Belanger's stock.[2] (A.R. 448.) Mr. Juliano met with Ms. Belanger on November 13, 2007, at which time she liquidated the three CDs, requested rollover of the two IRAs, and applied for two Bankers Life ten-year single-premium deferred annuities. (A.R. 448.)

The first annuity was purchased on November 14, 2007, for a premium of $37,530, funded with the proceeds from sale of the three CDS. (A.R. 448.) This annuity is the CD Proceeds Annuity. (A.R. 448.)

---

[2] Mr. Farren's presence was necessary because Mr. Juliano did not have a securities license. (A.R. 448.)

The second annuity, referred to as the IRA Rollover Annuity, was issued on December 3, 2007, for a premium of $17,352.06, funded with the proceeds from Ms. Belanger's surrender of a Jackson National annuity she had owned. (A.R. 449.) The Jackson National annuity had a base interest rate of 3.45% and a guaranteed rate of 3.00%. (A.R. 460.) The anticipated premium for the IRA Rollover Annuity was $48,000, but Ms. Belanger was unable to combine an IRA she inherited with her personal IRA. (A.R. 449.) The IRA Rollover Annuity had a base interest rate of 3.25%, with a 3% one-time bonus interest payment that increased the effective rate to 6.25% for the first year, and a guaranteed rate of 2.50%. (A.R. 460.)

The third and final annuity, called the Stock Proceeds Annuity, was issued on December 13, 2007, with the proceeds from the sale of her GE stock. (A.R. 449.) Ms. Belanger sold her GE stock on November 29, 2007, for $150,253. (A.R. 449.) Ms. Belanger consulted a tax professional and alerted Mr. Juliano that she intended to purchase what became the Stock Proceeds Annuity annuity. (A.R. 449, 459-60.) She held back $15,000 of the sales proceeds for taxes and personal expenses, and then purchased the Stock Proceeds Annuity for a premium of $135,000. (A.R. 449.) The taxes on the stock sale were $9,000. (A.R. 462-63.)

In order to establish and document that these investment vehicles were appropriate for Ms. Belanger, Mr. Juliano completed two "Fact Finders," a series of questionnaires developed by Bankers Life for its producers to assess the needs of prospective clients and the suitability of investments. (A.R. 449.) The first Fact Finder was submitted with the applications for the CD Proceeds and IRA Rollover Annuities on November 13, 2007; the second Fact Finder was submitted with the Stock Proceeds Annuity application, on November 15, 2007. (A.R. 450.) Mr. Juliano testified that Ms. Belanger refused to sign the first Fact Finder because she felt no need to sign it; Ms. Belanger did in fact sign the second Fact Finder. (A.R. 450, 1260.)

3

After Mr. Juliano sold Ms. Belanger the three annuities, Ms. Belanger "loaned" money to Mr. Juliano for a snowmobile in December of 2007. (A.R. 450.) Ms. Belanger bought, insured, and financed a snowmobile in her own name with her own funds, and Mr. Juliano immediately took possession of the snowmobile. (A.R. 451.) The price of the snowmobile, as evidenced by the loan application Ms. Belanger signed, was $9,499, plus $768.95 in taxes and fees. (A.R. 451.) Ms. Belanger made a cash down payment of $3,096.45. (A.R. 451.) Mr. Juliano did not keep a copy of the alleged contract between him and Ms. Belanger, or keep a balance of the amount owed on the loan. (A.R. 456.) Eventually, Mr. Juliano paid off the loan to Ms. Belanger in November of 2008, and Ms. Belanger signed a bill of sale transferring ownership of the snowmobile to Mr. Juliano. (A.R. 452.)

In April of 2008, Mr. Juliano sold Ms. Belanger a long-term care policy, using financial information contained in the first Fact Finder from about six months before. (A.R. 451-52.)

In the spring of 2008, Ms. Belanger informed Mr. Juliano that her roof was leaking and she needed money for a new roof. (A.R. 451.) Because Ms. Belanger could not get a bank loan for the roof because of her AMEX balance, Mr. Juliano helped her withdraw money from one of her annuities so she could qualify for the loan. (A.R. 451-52.) By September of 2008, Ms. Belanger had cash flow issues and was unable to keep up with her expenses, including the roof loan, the snowmobile loan, and setting aside money for the taxes on her house. (A.R. 452.) Ms. Belanger surrendered the CD Proceeds Annuity on October 10, 2008. (A.R. 452.)

The Bureau of Insurance Staff filed a petition for enforcement against Mr. Juliano and Bankers Life on September 28, 2009. (A.R. 446.) A public adjudicatory hearing was held on January 27, 28, 29, and 31 of 2011. (A.R. 446.) The Superintendent issued her decision on May 12, 2011. (AR. 470.) The Superintendent found that Mr. Juliano committed five violations of 24-A M.R.S. § 1420-K(1)(H) (2010), one violation of 24-A M.R.S. § 2155 (2010), and four

4

violations of 02-031 C.M.R. ch. 917, § 6 (2007) (hereinafter, "Rule 917"), in the annuity transactions with Ms. Belanger. (A.R. 468-69.) In addition, Mr. Juliano committed one violation of 24-A M.R.S. § 1445(2) (2010) and two violations 24-A M.R.S. § 1420-K(1)(H) in the snowmobile transaction with Ms. Belanger. (A.R. 468.) The Superintendent revoked Mr. Juliano's producer's license and fined him $10,000. (A.R. 469.) Based on the violations related to the annuities, the Superintendent fined Bankers Life $100,000 ($10,000 per violation) for its failure to make any meaningful effort to prevent improper sales or take timely corrective action. *See* 24-A M.R.S §§ 12-A(6), 1445(1)(D) (2010). (A.R. 469.)

Pursuant to M.R. Civ. P. 80C and Bankers Life and Mr. Juliano filed separate, timely appeals in Kennebec County Superior Court. The two appeals were consolidated before transfer into the Business and Consumer Court on July 1, 2011. The court heard oral argument on these appeals on December 9, 2011.

## *STANDARD OF REVIEW*

In an appeal of final agency action brought pursuant to M.R. Civ. P. 80C, this court reviews "the agency's decision for errors of law, abuse of discretion, or findings not supported by substantial evidence in the record." *Beauchene v. Dep't of Health & Human Servs.*, 2009 ME 24, ¶ 11, 965 A.2d 866 (quotation marks omitted); *see also Seider v. Bd. of Exam'rs of Psychologists*, 2000 ME 206, ¶ 8, 762 A.2d 551. In an 80C appeal of an agency's decision, the court may affirm the decision, 5 M.R.S. § 11007(4)(A) (2010), remand for further proceedings, 5 M.R.S. § 11007(4)(B) (2010), or:

[r]everse or modify the decision if the administrative findings, inferences, conclusions or decisions are:

(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Affected by bias or error of law;
(5) Unsupported by substantial evidence on the whole record; or

5

**(6)** Arbitrary or capricious or characterized by abuse of discretion.

5 M.R.S. § 11007(4)(C) (2010).

Factual findings must be affirmed if "they are supported by substantial evidence in the record, even if the record contains inconsistent evidence or evidence contrary to the result reached by the agency." *Concerned Citizens to Save Roxbury v. Bd. of Envtl. Prot.*, 2011 ME 39, ¶ 24, 15 A.3d 1263 (quotation marks omitted). "The 'substantial evidence' standard does not involve any weighing of the merits of evidence." *Friends of Lincoln Lakes v. Bd. of Envtl. Prot.*, 2010 ME 18, ¶ 14, 989 A.2d 1128. Instead, the substantial evidence standard require the court to determine if there is "any competent evidence in the record to support a finding," based upon a review of the entire record, to determine whether "the agency could fairly and reasonably find the facts as it did." *Concerned Citizens to Save Roxbury*, 2011 ME 39, ¶ 24, 15 A.3d 1263. "An agency's findings of fact will be vacated only if there is no competent evidence in the record to support a decision." *Id.* (quotation marks omitted). Finally, credibility determinations of witnesses are within the exclusive province of the Superintendent as fact finder. *See Sprague Elec. Co. v. Me. Unemployment Ins. Comm'n*, 544 A.2d 728, 732 (Me. 1988).

<em>BANKERS LIFE 80C APPEAL</em>

Bankers Life challenges each violation of the Insurance Code found by the Superintendent that was imputed to it through 24-A M.R.S. § 1445(1)(D), which states that insurers are "accountable and may be penalized by the superintendent, as provided for in this Title, for the actions of its producers." Mr. Juliano joins in Bankers Life's arguments as to each of his individual violations.

I.  Individual Violations

    A.  Violation #1 – Rule 917, § 6(A): An unsuitable annuity sales recommendation that failed to reserve sufficient stock proceeds to meet Ms. Belanger's stated liquidity needs.

6

The Superintendent concluded that the recommendation for the Stock Proceeds Annuity was unsuitable because it failed to reserve sufficient cash to meet Ms. Belanger's liquidity needs in violation of section 6(A) of Rule 917. (A.R. 468.) Thus, the Superintendent found that the amount of the annuity was unsuitable. As noted, Ms. Belanger sold her General Electric stock on November 29, 2007, for $150,253. (A.R. 449.) She held back $15,000 for taxes and personal expenses, and then purchased the Stock Proceeds Annuity for $135,000. (A.R. 449.) The taxes on the stock sale were $9,000, leaving her with $6,000. (A.R. 462-63.) Ms. Belanger had an additional $10,000 in savings accounts, leaving her with $16,000 in cash after the annuity transactions. (A.R. 450.) Ms. Belanger had told Mr. Juliano that she needed $20,000 of her savings to be totally liquid and accessible for her use. (A.R. 462, 1227, 1260.)

Rule 917 provides, in relevant part:

> In recommending to a consumer the purchase of an annuity or the exchange of an annuity that results in another insurance transaction or series of insurance transactions, the insurance producer, or the insurer where no producer is involved, must have reasonable grounds for believing that the recommendation is suitable for the consumer on the basis of the facts disclosed by the consumer as to his or her investments and other insurance products and as to his or her financial situation and needs.

Rule 917, § 6(A). Bankers Life challenges the suitability violation on four grounds: 1) the Superintendent's mathematical calculations of Ms. Belanger's liquidity, 2) insufficient evidence to support the finding that Ms. Belanger would have insufficient liquidity, 3) the Superintendent's interpretation of suitability in Rule 917, and 4) the burden of proof utilized by the Superintendent.

Bankers Life argues that the Superintendent improperly applied a test that required the transaction to be the *most* suitable investment for Ms. Belanger, not just *a* suitable investment. While portions of the decision may indicate that the Superintendent applied this standard,

7

those portions are discussions of violations alleged by Bureau staff that the Superintendent did not find that Mr. Juliano or Bankers Life had committed. (A.R. 458-59, 461-62.)

The parties' primary dispute is whether Ms. Belanger's ability to withdraw a certain proportion penalty-free from the Bankers Life annuities can be considered a part of her liquid assets. Bankers Life asserts that Ms. Belanger's annuities can constitute liquid assets and that the Superintendent's finding of unsuitability for illiquidity is not supported by the record; the Superintendent asserts that only cash on hand is a liquid asset. Regardless of whether the annuities can be considered part of Ms. Belanger's liquid assets, the record supports the finding that the Stock Proceeds Annuity did not leave Ms. Belanger with enough liquidity, as evidenced by Ms. Belanger's withdrawal of money from one of the annuities, additional loan to fix her roof, the surrender of the CD Proceeds Annuity. (A.R. 451-52.) The undisputed facts are that Mr. Juliano knew that Ms. Belanger wanted to have $20,000 *in cash* after the annuity transactions, and she did not get it.

Bankers Life contends that it was Ms. Belanger's choice to invest $135,000; the application Mr. Juliano filled out for the Stock Proceeds annuity listed the purchase price as $130,000. (A.R. 449, 1241.) After Ms. Belanger sold the GE stock and consulted a tax professional, Ms. Belanger alerted Mr. Juliano that she intended to purchase $135,000 annuity. (A.R. 449, 459-60.) Bankers Life asserts that pursuant to Rule 917, an insurer or producer has no obligation to a consumer related to a recommendation "if the consumer ... [d]ecides to enter into an insurance transaction that is not based on a recommendation of the insurer or insurance producer." Rule 917, § 6(C)(1)(b).

Be this as it may, the record plainly supports a finding that Mr. Juliano obviously knew she was paying $135,000 but never raised with her the effect of doing so on her cash position. This court's role is not to reevaluate the evidence; the court may only determine if the findings

8

are supported by substantial evidence in the record. *See Friends of Lincoln Lakes*, 2010 ME 18, ¶ 14, 989 A.2d 1128. The court cannot say that the finding of unsuitability based on illiquidity is unsupported by the record. *See Concerned Citizens to Save Roxbury*, 2011 ME 39, ¶ 24, 15 A.3d 1263. Accordingly, the appeals on this issue do not prevail.

B.    <u>Violation #2 – 24-A M.R.S. § 2155: A misleading comparison of Ms. Belanger's existing annuity with the IRA Rollover Annuity</u>

Ms. Belanger had an existing Jackson National annuity with a base interest rate of 3.45% and a guaranteed rate of 3.00%. (A.R. 460.) The IRA Rollover Annuity, i.e., the Bankers Life annuity purchased through Mr. Juliano to replace the Jackson National annuity, had a base interest rate of 3.25%, with a 3% one-time bonus interest payment that increased the effective interest to 6.25% for the first year, and a guaranteed rate of 2.50% thereafter. (A.R. 460.) The Superintendent found that "in order to show [Ms. Belanger] that Bankers Life would provide the better rate that [she] wanted," Mr. Juliano compared the guaranteed rate of interest for the first year, which included the 3% bonus and thus artificially inflating the rate to 6.25%, against the interest rate that she was getting at the time from Jackson National, 3.45%. (A.R. 464.)

The Superintendent found, based on Mr. Juliano's testimony, that Mr. Juliano "gave a misleading description of the first-year bonus, and failed to disclose that lower rates were already in effect." (A.R. 465.) The Superintendent thus concluded that Mr. Juliano violated 24-A M.R.S. § 2155 by using a misleading comparison between the terms of the two annuity contracts. (A.R. 466, 468.)

Section 2155 provides:

> No person shall make or issue, or cause to be made or issued, any written or oral statement misrepresenting or making incomplete comparisons as to the terms, conditions, or benefits contained in any policy for the purpose of inducing or attempting or tending to induce the policyholder to lapse, forfeit, borrow against, surrender, retain, exchange, modify, convert, or otherwise affect or dispose of any insurance policy.

9

24-A M.R.S. § 2155. Bankers Life identifies additional evidence in the record to undercut the Superintendent's finding of Mr. Juliano making a "misleading" statement: Ms. Belanger was dissatisfied with Jackson National's customer service was willing to take a lower interest rate for better service, and Ms. Belanger received disclosures identifying the actual interest rate. (A.R. 1065, 1078, 1081, 1539.) Bankers Life suggests, that in light of these undisputed facts, the Superintendent's conclusion that Mr. Juliano did not give Ms. Belanger "all the information she needed to make that decision for herself on a fully informed basis" is based on her own subjective opinion.

Nevertheless, it is undisputed that during his initial discussions with Ms. Belanger, Mr. Juliano included the 3% bonus payment when comparing the Banker Life annuity to Ms. Belanger's existing annuity. Regardless of whether Ms. Belanger was willing to take a lower rate, or whether he did or did not provide further information that the Superintendent thought necessary to make an informed decision, the record supports the conclusion that Mr. Juliano made an incomplete and misleading comparison between the IRA Rollover Annuity and Ms. Belanger's existing annuity. *See Concerned Citizens to Save Roxbury*, 2011 ME 39, ¶ 24, 15 A.3d 1263. The additional countervailing evidence cited by the petitioners might well have led a different fact finder to reach a different conclusion, but it does not detract from the sufficiency of the evidence that the Superintendent relied on to support her determination. The appeals fail as to this issue.

C. Violation #3 – 24-A M.R.S. § 1420-K(1)(H): Dishonest practices in using the first-year bonus to make a misleading comparison of the IRA Rollover Annuity and CD Proceeds Annuity with the yields of Ms. Belanger's existing investments

The Superintendent concluded that Mr. Juliano's misleading comparison between the Bankers Life annuities and her existing annuity was a dishonest practice. (A.R. 468.) Section 1420-K(1)(H) permits the Superintendent to

10

place on probation, suspend, revoke or refuse to issue or renew an insurance producer's license or . . . levy a civil penalty in accordance with section 12-A or take any combination of such actions, for any one or more of the following causes:

. . . .

H. Using fraudulent, coercive or dishonest practices, or demonstrating incompetence, untrustworthiness or financial irresponsibility in the conduct of business in this State or elsewhere.

24-A M.R.S. §§ 1420-K(1)(H). Because the record supports the conclusion that Mr. Juliano made a misleading comparison, it also supports the conclusion that the misleading comparison constituted a dishonest practice for purposes of the quoted statute.

D.    Violation #4 – 24-A M.R.S. § 1420-K(1)(H): Dishonest practices in submitting an unsigned Fact Finder for the first two annuity purchases and misrepresenting that the client refused to sign

The Superintendent concluded that Mr. Juliano engaged in a dishonest practice in explaining why the first Fact Finder was unsigned by Ms. Belanger. (A.R. 468.) The Fact Finder at issue was dated November 13, 2007, submitted with the annuity applications for the IRA Rollover Annuity and the CD Proceeds Annuity, and contained the following notation on the signature line: "Client did not feel the need to sign file." (A.R 450.) Two days later, a similar Fact Finder was submitted with the Stock Proceeds Annuity, which Ms. Belanger did sign. (A.R. 450, 1260.) Mr. Juliano testified at the hearing that Ms. Belanger refused to sign the Fact Finder at first because she did not feel the need to sign it. (A.R. 1520, 1522.)

The Superintendent found Mr. Juliano's testimony that Ms. Belanger refused to sign the Fact Finder "implausible" because Ms. Belanger signed 22 other documents that day and was willing to sign an updated Fact Finder two days later with the Stock Proceeds Annuity. (A.R. 464.) The Respondent, in its brief and at oral argument, confirmed that the dishonest practice is not the lack of signature, but the misrepresentation of why there was no signature.

11

Although Bankers Life contends that there is no evidence that Mr. Juliano misrepresented that Ms. Belanger did not want to sign the Fact Finder, the court disagrees.

The evidence in the record is that Mr. Juliano gave an explanation for the lack of signature so at odds with other evidence that the Superintendent decided he was not telling the truth. The Superintendent, based on her credibility determination of Mr. Juliano and the fact that Ms. Belanger signed other documents the same day and signed the same type of document on a subsequent day, found that Mr. Juliano affirmatively misrepresented Ms. Belanger's choice. Because credibility determinations of witnesses are within the exclusive province of the Superintendent as fact finder, *see Sprague Elec. Co*, 544 A.2d at 732 (Me. 1988), and because findings may rest on determinations of lack of credibility as well as credibility, *see Qualey v. Fulton*, 422 A.2d 773, 776 (Me. 1980), the Superintendent's conclusion must be affirmed as supported by competent record evidence.

E.  Violations ## 5-7: Rule 917, § 6(B) – Failure to make reasonable inquiries to gather suitability information in connection with each of the three annuity applications[3]

The Superintendent concluded that Mr. Juliano failed to make reasonable inquiries to gather suitability information in connection with each of the three annuity applications, in violation of

B.  Prior to the execution of a purchase or exchange of an annuity resulting from a recommendation, an insurance producer, or an insurer where no producer is involved, must make reasonable efforts to obtain information concerning:

(1)  The consumer's financial status;

(2)  The consumer's tax status;

(3)  The consumer's investment objectives; and

---

[3] The operative conclusions at the end of the decision actually asserts violations of section 6(A) of Rule 917 (A.R. 468), but the parties agreed that when read as a whole, the decision includes the Superintendent's conclusion that Mr. Juliano violated Rule 917, both by failing to make reasonable efforts to obtain the information necessary to evaluate the suitability of his recommendations, *and* also by failing to make a reasonable suitability evaluation based on the information he had obtained." (A.R. 464 (emphasis added).)

12

(4)    Such other information used or considered to be reasonable by the insurance producer, or the insurer where no producer is involved, in making recommendations to the consumer.

Rule 917, § 6.  The parties agree that the Superintendent found that Mr. Juliano failed to gather more information about Ms. Belanger's debts and expenses and the penalties she would incur in terminating her CDs.  (A.R. 463.)  Respondent points to the Fact Finders, which describe the extent of Ms. Belanger's assets but not the extent of her liabilities.  (A.R. 525-26.)  Mr. Juliano made no inquiry into how much Ms. Belanger owed on her AMEX card or the extent of her charitable donations.

Again, the court's role is not to reevaluate the evidence; the court may only determine if the findings are supported by substantial evidence in the record.  *See Friends of Lincoln Lakes*, 2010 ME 18, ¶ 14, 989 A.2d 1128.  The court cannot say that the finding that Mr. Juliano failed to take reasonable efforts to obtain information necessary to evaluate the suitability of his recommendations is unsupported by the record.  *See Concerned Citizens to Save Roxbury*, 2011 ME 39, ¶ 24, 15 A.3d 1263.

F.    Violations ##8-10: 24-A M.R.S. § 1420-K(1)(H):  Demonstrating incompetence or untrustworthiness in the submission of materially inaccurate information about Ms. Belanger's financial situation in each of the three annuity applications[4]

The Superintendent concluded that there were two inaccuracies in the two Fact Finders submitted with Ms. Belanger's annuity applications:  1) the first Fact Finder, dated November 13, 2007 (A.R. 526), and submitted in support of the CD Proceeds Annuity and IRA Rollover Annuity, listed her stock assets as only $5000-$7000, when she held nearly $150,000 worth of GE stock; 2) the second Fact Finder and corresponding suitability questionnaire, both dated

---

[4] The Superintendent also noted that there were inaccuracies about Ms. Belanger's health, but did not penalize Mr. Juliano for inaccuracies in the health information.  (A.R. 464, 469.)  The Superintendent identified another financial inaccuracy in the Fact Finder submitted with Ms. Belanger's long term care insurance, but found no violation of the statute with respect to that document.  (A.R. 464.)  Further, the Superintendent questioned the recordation of $10,000 in savings, but did not find that it was inaccurate.  (A.R. 463.)

13

November 15, 2007 (A.R. 1251, 1260), and submitted in support of the Stock Proceeds Annuity, continued to list Ms. Belanger's assets to include $37,000 in CDs and $18,000 in annuities, even though those assets had been liquidated. (A.R. 464.) In addition, the Superintendent found that the information on the Fact Finders regarding Ms. Belanger's expenses was inadequate and did not reflect her expenses. (A.R. 463.)

The three annuities have the following issue dates:

- CD Proceeds Annuity: November 14, 2007
- IRA Rollover Annuity: December 3, 2007
- Stock Proceeds Annuity: December 11, 2007.

(A.R. 448-49.) Ms. Belanger did not sell her GE stock until November 29, 2007. (A.R. 449.) Thus, the first two violations are supported by substantial evidence in the record because in the first Fact Finder, Mr. Juliano did not include the value of the GE stock that she still held in Ms. Belanger's assets. The finding that he included liquidated assets in the second Fact Finder also is supported: the IRA annuity was not issued until December 3, 2007, and thus the IRA assets were still unliquidated on November 15, 2007. The dates of all these transactions are fairly close, but the court must conclude that there is competent record evidence to support the Superintendent's conclusions.

II.    Vicarious Liability of Bankers Life

In a pre-hearing ruling, the Superintendent ordered that Bankers Life would be responsible for Mr. Juliano's misconduct, pursuant to 24-A M.R.S. § 1445(1), "to the extent and to the degree that [Bureau of Insurance] Staff demonstrates a factual and legal basis for holding Bankers Life responsible." (A.R. 114, 467.) Title 24-A M.R.S. § 1445(1) provides regarding the responsibilities of insurers:

14

**1. Responsibilities for training and supervision.** In addition to any other applicable provisions of law, the insurer, health maintenance organization, fraternal benefit society or nonprofit hospital or medical service organization:

    **A.** Shall ensure adequate training for its appointed producers;

    **B.** Shall provide supervision of its appointed producers who sell insurance on its behalf;

    **C.** Is responsible for injuries to consumers resulting from the actions of its appointed producers to the extent of restitution, reimbursement of money or payment of interest to the consumer; and

    **D.** *Is accountable and may be penalized by the superintendent, as provided for in this Title, for the actions of its producers.*

(Emphasis added). The Insurance Code permits the Superintendent, after an adjudicatory hearing, to assess "a civil penalty of to $10,000 fore ach violation in the case of a corporation or other entity other than an individual." 24-A M.R.S. § 12-A(1) (2010). The Superintendent held Bankers Life accountable for Mr. Juliano's suitability violations and deceptive sales practice violations related to the annuity transactions because Bankers Life failed "to conduct adequate supervision and fail[ed] to follow its own suitability review processes in an effective manner." (A.R. 467.) The Superintendent specifically found that Mr. Juliano was not in close contact with the Bangor office of Bankers Life, as evidenced by Mr. Juliano not having a working understanding of the organization structure of that office. (A.R. 446-47.) The Superintendent also noted that Bankers Life had a prior history of suitability violations and entered into a consent agreement in 2005 regarding its suitability training and compliance procedures. (A.R. 466.)

Although Bankers Life asserts there is no justification for holding it responsible for the acts of Mr. Juliano, the Superintendent, consistent with her previous ruling, found that Bankers Life's failure to supervise Mr. Juliano justified imposing penalties on the insurer. Based on the court's review of the statute, however, such a finding was arguably unnecessary. The statute

15

makes an insurer vicariously liable for the actions of its producers. *See* 24-A M.R.S. § 1445(1)(D). Given her findings regarding lack of supervision and Bankers Life's prior history, the Superintendent was certainly well within her discretion under the statute in imposing penalties on Bankers Life and, based upon previous violations, imposing the maximum penalty.

III.    Bias and Prejudice

Bankers Life argues that the Bureau's investigation was biased due to unprofessional behavior of the lead investigator and the failure to consider exculpatory information—the "Doughty report." Although Bankers Life's assertion of bias is supported, it does not relate to the Superintendent herself. Moreover, the allegedly biased behavior did not factor into her decision and cannot be imputed to her. She, not the investigator, was the decision maker, and the court can divine no evidence of bias or prejudice on her part from the record.

## MR. JULIANO'S 80C APPEAL

In addition to joining in the arguments of Bankers Life with regards to the annuity transactions, Mr. Juliano also appeals the Superintendent's conclusions regarding the snowmobile transaction. Based on this transaction, the Superintendent found one violation 24-A M.R.S. § 1445(2): misuse of customer information for personal gain in inducing Ms. Belanger to buy the snowmobile. (A.R. 468.) The Superintendent also found two violations 24-A M.R.S. § 1420-K(1)(H): 1) dishonest practices and demonstrating untrustworthiness and financial irresponsibility in inducing Ms. Belanger to buy the snowmobile, and 2) demonstrating untrustworthiness and financial irresponsibility in failing to keep accurate records of the snowmobile transaction. (A.R. 468.)

Section 1445(2) provides:

A licensed insurance producer in this State may not . . . [u]se knowledge gained as a result of the producer's insurance relationship with the insurance consumer for the producer's own personal gain, other than the receipt of fees or commissions allowed under section 1450, or use knowledge gained as a result of

16

the relationship for the purpose of investing the insurance consumer's money in property or assets in which the insurance producer or the producer's relatives have or will have a personal ownership interest unless that activity is otherwise authorized under insurance, banking or securities laws or rules.

Mr. Juliano first argues that he did not affirmatively use knowledge gained from his relationship with Ms. Belanger because he asserts that the snowmobile transaction was Ms. Belanger's idea. The argument misses the mark; the Superintendent specifically found that "Mr. Juliano abused [Ms. Belanger]'s trust that arose from the business relationship, and used his knowledge of [Ms. Belanger]'s finances and interests when he borrowed from her." (A.R. 457.) There is ample evidence to support the conclusion that Mr. Juliano misused his knowledge of Ms. Belanger's finances for his own personal gain to induce her to purchase a snowmobile for him. *See* 24-A M.R.S. § 1445(2).

Mr. Juliano's second and third arguments address the violations of section 1420-K(1)(H). Mr. Juliano's second argument relies on his claim that Ms. Belanger offered to lend Mr. Juliano the money of her own free will, a claim that the Superintendent rejected. Mr. Juliano asserts that the snowmobile transaction was a personal arrangement, and thus not "in the conduct of business." *See* 24-A M.R.S. § 1420-K(1)(H). This argument neglects the fact that the snowmobile transaction was during the course of their business relationship, between the annuity transactions and the long-term care policy transaction. While Mr. Juliano argues that the snowmobile was only his responsibility, it was Ms. Belanger who signed the financing arrangement, thus obligating her to the financing lender. There is ample support in the record for the Superintendent's conclusion that Mr. Juliano engaged in dishonest practices and financial irresponsibility when inducing Ms. Belanger to purchase the snowmobile for him. Similarly, it was financially irresponsible for Mr. Juliano not to keep a copy of the alleged contract between him and Ms. Belanger, or keep tally of the amount owed on the loan. (A.R. 456.)

17

## CONCLUSION

Based on the foregoing the court decides and orders as follows:

The petitioners are denied. The court affirms the decision of the Superintendent of Insurance dated May 12, 2011, in its entirety.

Pursuant to M.R. Civ. P. 79(a), the Clerk shall incorporate this Decision and Order into the docket by reference.

Date: 2 f FEB. 2o /2

A. M. Horton, Justice
Maine Business & Consumer Court

Entered on the Docket: 2 21. 12
Copies sent via Mail ___ Electronically ___

18

STATE OF MAINE
CUMBERLAND, ss.

BUSINESS AND CONSUMER DOCKET
Location:    Portland

BANKERS LIFE & CASUALTY CO.
And MATTHEW F. JULIANO

Petitioners,

v.

DOCKET NO. BCD-AP-11-09
BCD-AP-11-10

SUPERINTENDENT OF INSURANCE

Respondent

## COUNSEL OF RECORD

**Party Name:**

Banker's Life & Casualty Co.

Matthew Juliano

Superintendent of Insurance

**Attorney Name:**

Christopher Roach, Esq.

Sean Farris, Esq.

Andrew Black, AAG